OPINION OF THE COURT
Carolyn E. Demarest, J.
Elizabeth A. and Greg T. entered into a contractual agreement whereby Elizabeth A. agreed to be artificially inseminated with the semen of Greg T. so that she might conceive and give birth to the child of Greg T. Pursuant to contract, such child would then be immediately placed in the custody of Greg T. and his wife, who has been unable to conceive "for over a year”. This contract, denominated "Surrogate Parenting Agreement”, is 49 pages long, including exhibits, and provides for payment to Elizabeth A. of $10,000 upon her *380 surrender of custody of the child or children to Greg T., or if he is dead, to his wife, or if both are dead, to the "guardian” identified as Greg’s brother. The agreement further provides that Elizabeth A. shall, "upon birth of the child, terminate any and all parental rights with respect to the child, and shall have no rights of visitation following the birth of the child”. However, the agreement also specifically states that the $10,000 payment to Elizabeth A. over and above all other expenses relating to the insemination, pregnancy and birth (including medical, legal and psychological expenses as well as clothing up to $500) "is in no way to be construed as a fee for termination of parental rights by Elizabeth A. or a payment or exchange for a consent to surrender the child for adoption or to assist in the adoption of the child or as payment of any expenses for living or maternity care between the birth of the child and the adoption of the child by Greg T.”
Elizabeth A. further acknowledges, both in the body of the agreement and in exhibit A, a handwritten "Declaration of Intent”, that the sole purpose of the proposed conception is to provide the child to Greg T. and it is "without any consideration other than concern for the best interests and welfare of the child” that Elizabeth A. agrees to surrender her parental rights and give immediate and uncontested custody to Greg T.
Nearly a year prior to the execution of the agreement between Elizabeth A. and Greg T., Greg T. executed an "agreement” with "the Surrogate Mother Program”, a New York corporation, pursuant to which Greg T. agreed to pay to "the Surrogate Mother Program” a nonrefundable fee of $8,500 in exchange for counseling, advice, referrals for medical, legal and other professional services not supplied by the program, and particularly in consideration of the program’s supplying an appropriate "surrogate” mother for the proposed child. In addition to the $8,500 fee to the Surrogate Mother Program, Greg agreed to pay a $10,000 "Surrogate Mother Fee” and various other expenses to be generated in the execution of the contract, estimated to be in excess of $4,000.
On December 2, 1988, a male child, Paul T., was born to Elizabeth A. No father is named on the birth certificate.
Apparently intending to perform her obligations under the "Surrogate Parenting Agreement”, Elizabeth A. now seeks to appear before this court for the purpose of executing a "Judicial Consent” to the adoption of her son by Greg T. and his wife. Her "Affidavit of Financial Disclosure — Natural Moth *381 cr”, which has not been executed, does not reflect payment to her of the $10,000 fee. It does, however, recite payment by the prospective adoptive parents of $7,500 to the “Surrogate Mother Program”. Similarly, though they do acknowledge payment of fees approximating $8,000 to the “Surrogate Mother Program”, the proposed adoptive parents have not disclosed the fee of $10,000 to be paid to Elizabeth in their affidavit of financial disclosure, which has been executed. Presumably because the agreement provides that Elizabeth’s “consideration” is to be held in escrow until she has performed all of her obligations, which include the “surrender” of her child to Greg T. and his wife, Elizabeth may not feel the need to disclose receipt of her fee prior to surrender. However, that the aforementioned agreements have been submitted as part of the documents in support of the surrender ?.;id subsequent adoption indicates to this court that Elizabeth A. does anticipate receiving this “consideration” in exchange for her execution of the judicial consent surrendering her parental rights.
Under the circumstances, it is appropriate and necessary, prior to Elizabeth’s appearance, to determine whether her contract with Greg T. is legal under the laws of the State of New York or whether Elizabeth’s surrender can only be accepted by this court if she foreswears acceptance of the benefit of her bargain and thus assures this court that such surrender is truly voluntary and is motivated by her concern for the best interests of her child and not the promise of financial gain.
This court has found only one reported New York case squarely in point. In 1986, in Matter of Baby Girl L. J. (132 Misc 2d 972), Surrogate Radigan in Nassau County found a surrogate parenting agreement, virtually identical to that at issue here, to be voidable, but not necessarily void, depending on whether the adoption statutes are violated or not. In that case, despite his "strong reservations about these arrangements both on moral and ethical grounds” (at 978), Surrogate Radigan approved the fee paid to the “surrogate mother” and permitted the adoption as being in the best interests of the child. Surrogate Radigan found nothing in current law to prohibit the surrogate parenting arrangement, but called upon the Legislature to give direction as to the legality of the payments made.
Subsequently, in response to Surrogate Radigan’s plea, and in light of the infamous Matter of Baby M case (109 NJ 396, *382 537 A2d 1227 [1988]) then under litigation in New Jersey, New York Senator John Dunne drafted and introduced Senate Bill S1429 which approves the surrogate parenting process and provides an elaborate scheme for its regulation, including judicial approval prior to execution of the agreement. Despite the extensive study that had preceded its introduction, this bill never passed. (1987 NY St Sen Jud Comm Report, Surrogate Parenting in New York, A Proposal for Legislative Reform; Katz, The Public Policy Response to Surrogate Motherhood Agreements: Why They Should Be Illegal and Unenforceable, 60 [No. 4] NY St BJ 21 [May 1988].) Numerous other bills, ranging from total prohibition of surrogate parenting to varying degrees of regulation, have also failed passage in the New York Legislature. (See, Zeldis, New York Seen Facing Delays On Surrogate Mother Measure, NYLJ, Apr. 27, 1987, at 1, col 3.) Assembly Bill A994, introduced on January 4, 1989, which prohibits payment of any compensation in connection with a surrogate parenting agreement, is currently pending committee consideration in the Legislature. As there is no clear legislative direction on this subject at present, this court must look to the law governing adoption generally to determine the legality of this agreement. Guidance has also been sought from the law of other jurisdictions.
In New Jersey, even as debate continued in the New York Legislature concerning the propriety of approving and regulating surrogate parenting, the infamous Matter of Baby M case was decided. Reversing the trial court’s approval and enforcement of the contract, the New Jersey Supreme Court unequivocally held surrogate parenting contracts to be contrary to State policy and statutes and unenforceable. (Matter of Baby M, 109 NJ 396, 537 A2d 1227, supra.) The New Jersey Supreme Court characterized the surrogacy contract between Mr. Stern and Mrs. Whitehead, which was essentially identical to that at issue here, as "baby-bartering”, a practice which the court noted is illegal and perhaps criminal. (109 NJ, at 425, 537 A2d, at 1240-1241.) This court finds the analysis and conclusion reached by the New Jersey Supreme Court compelling.
Like New Jersey, New York’s adoption statutes prohibit the request, acceptance, receipt, payment or gift of "any compensation or thing of value, directly or indirectly, in connection with the placing out or adoption of a child or for assisting a parent, relative or guardian of a child in arranging for the placement of the child for the purpose of adoption” by any *383 person other than an authorized agency. (Social Services Law § 374 [6].) Reimbursement or payment is expressly permitted for actual medical or other necessary expenses incurred by the mother in connection with, or as a result of, her pregnancy or the birth of the child. It is clear from the language of the statute that compensation direct to the mother for her "services” in conceiving, carrying and giving birth to the child is not permitted.
Such remuneration to a mother, in exchange for her surrender of the child for adoption, violates New York’s well-established policy against trafficking in children. (See, Matter of Anonymous, 286 App Div 161, 166 [2d Dept 1955], in which the court stated: "[The natural mother] may place her child with others for adoption, but she may neither demand nor accept any compensation therefor except for reasonable medical fees and hospital charges connected with her confinement”; see also, Barry E. v Ingraham, 43 NY2d 87, 94 [1977]; Matter of Grand Jury Subpoenas [Morgenthau], 58 AD2d 1, 6 [1st Dept 1977]; Matter of Jose L., 126 Misc 2d 612 [Fam Ct, Queens County 1984]; Social Services Law § 374 [6].)
In Doe v Attorney General (106 Mich App 169, 307 NW2d 438 [1981]), a statute substantively the same as New York’s Social Services Law § 374 (6) was challenged as unconstitutional in prohibiting the exchange of money or other consideration in connection with adoption and thereby frustrating the litigants’ alleged right to procreate a child under a surrogate parenting contract like that at bar. Rejecting this claim, the Michigan court held (106 Mich App, at 173-174, 307 NW2d, at 441): "While the decision to bear or beget a child has thus been found to be a fundamental interest protected by the right of privacy * * * we do not view this right as a valid prohibition to state interference in the plaintiffs’ contractual arrangement. The statute in question does not directly prohibit John Doe and Mary Roe from having the child as planned. It acts instead to preclude plaintiffs from paying consideration in conjunction with their use of the state’s adoption procedures. In effect, the plaintiffs’ contractual agreement discloses a desire to use the adoption code to change the legal status of the child i.e., its right to support, intestate succession, etc. We do not perceive this goal as within the realm of fundamental interests protected by the right to privacy from reasonable governmental regulation.” (Accord, Matter of Baby M, supra, 537 A2d, at 1253; contrast, Surrogate Parenting Assocs. v Commonwealth ex rel. Armstrong, 704 *384 SW2d 209 [Ky Sup Ct 1986], in which surrogate parenting arrangements were held not to be violative of that State’s laws prohibiting the buying and selling of children.) This court, based upon the same reasoning as that applied by the Michigan court, also finds no constitutionally protected right to participate in surrogate parenting arrangements which would contravene application of New York’s adoption laws in the case at bar.[1]
Moreover, the frequently articulated argument that "surrogate motherhood” is analogous to sperm donation in that it provides to infertile couples a means to achieve parenthood and should therefore be approved as a matter of equal protection, is not convincing. The very significant difference between these two methods of procreation is that a sperm is merely a gamete, potentially capable, if successfully joined with an egg, of creating an embryo which must then survive gestation to birth, while the "surrogate” mother is supplying a life-in-being, having provided, not only the egg, but protection and nourishment during gestation and having delivered a human child capable of independent survival. It is this difference that renders surrogate mothering for financial gain illegal baby-selling, notwithstanding the numerous disclaimers to the contrary contained in the agreement.[2]
This court is unable to concur in the determination of Surrogate Radigan in Matter of Baby Girl L. J (132 Misc 2d 972, supra) that payments pursuant to a surrogacy contract do not violate the law of this State. My analysis of the clear language of the statutes governing adoption, together with the policy of this State as articulated in case law, leads me to the conclusion, as stated by the New Jersey Supreme Court in Matter of Baby M, that the contract at bar provides for "the *385 sale of a child, or, at the very least, the sale of a mother’s right to her child” (supra, 109 NJ, at 437, 537 A2d, at 1248), in contravention of the law of this State. Such contracts are, therefore, void under the law of the State of New York as it exists at present.
Accordingly, only if Elizabeth will swear under oath before this court that she has not and will not request, accept or receive the $10,000 promised to her in exchange for surrender of her child, can this court accept such surrender and terminate her parental rights. Only if she is free of the intimidation inherent in her contractual commitment to give up her child and the inducement of a $10,000 gain, can Elizabeth’s surrender of her parental rights be truly voluntary and motivated exclusively by Paul’s best interests. Should Elizabeth sincerely believe that her son’s best interests alone require such surrender, without the inducement of financial reward to her, an affidavit to that effect, duly sworn and executed, should be submitted to this court so that a date may be scheduled for her appearance. In addition, consistent with Social Services Law § 374 (6), the proposed adoptive parents must also provide sworn affidavits evidencing their intent not to pay or give any compensation or thing of value to any party in exchange for the child. It is possible that payments already made to the Surrogate Mother Program violate Social Services Law § 374 (6) and may pose an obstacle to adoption. However, since that organization is not before the court and the precise application of moneys paid to the program are not sufficiently revealed in the papers, this court makes no ruling on those payments at this time.
Finally, it has been noted that Greg’s name does not appear on Paul’s birth certificate. It is also noted that two different surnames appear for Elizabeth in the documents heretofore submitted, raising a question as to whether Elizabeth is or has been married. This question has not been answered in Elizabeth’s own unsigned affidavit. Since her husband, if one exists, would be presumed at law to be Paul’s father, and thus a necessary party to the proposed adoption, this issue must be addressed in an affidavit from Elizabeth prior to any court appearance.
Should the necessary additional documents not be received by this court by May 1, 1990, the petition for adoption will be dismissed as abandoned.

. Several authorities argue that the Thirteenth Amendment of the US Constitution and the Federal Antipeonage Act (42 USC § 1994; 18 USC § 1581) unequivocally prohibit surrogate parenting contracts. (See, Means, Surrogacy v. The Thirteenth Amendment, 4 NY L Sch Hum Rts Ann 445 [1987]; Katz, 60 [No. 4] NY St BJ 21, 32 [May 1988].) Such argument need not be addressed here, however, as the decision of this court is premised upon the public policy of the State of New York as articulated in its adoption statutes.

. It is further significant in this regard that the Legislature has expressly condoned and protected the use of artificial insemination as a means to parenthood by providing that any child born by such means, with the written consent of a woman and her husband, is deemed, as a matter of law, the legitimate natural child of both parties. (Domestic Relations Law § 73.) Where the married couple both consent, the statute clearly precludes any question of paternity in the sperm donor, who is usually anonymous.