**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COYOTE PUBLISHING, INC., dba High
Desert Advocate; HOWARD
COPELAN, Publisher of the High
Desert Advocate; BOBBI A. DAVIS,
dba the Shady Lady Ranch; DR
PARTNERS, dba Las Vegas CityLife;
STEVE SEBELIUS, Editor of Las
Vegas CityLife,
　　　　　　　*Plaintiffs-Appellees,*

　　　　　　v.

ROSS MILLER, in his official
capacity as Secretary of State of
the State of Nevada; CATHERINE
CORTEZ MASTO, in her official
capacity as Attorney General of
the State of Nevada; DAVID ROGER,
in his official capacity as District
Attorney of Clark County,
Nevada,
　　　　　　　*Defendants-Appellants.*

No. 07-16633

D.C. No.
CV-06-00329-
JCM/PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
February 13, 2009—San Francisco, California

Filed March 11, 2010

Before: John T. Noonan, Marsha S. Berzon and
N. Randy Smith, Circuit Judges.

4109

Opinion by Judge Berzon;
Concurrence by Judge Noonan

## COUNSEL

Allen Lichtenstein, Lee Rowland & Margaret A. McLetchie, ACLU of Nevada for the plaintiffs-appellees.

C. Wayne Howle, Esquire, Solicitor General of Nevada for the defendant-appellant.

## OPINION

BERZON, Circuit Judge:

[A]s long as poverty makes virtue hideous and the spare pocket-money of rich bachelordom makes vice

dazzling, [the] daily hand-to-hand fight against pros-
titution with prayer and persuasion, shelters and
scanty alms, will be a losing one.

—George Bernard Shaw, *Preface to Mrs.
Warren's Profession* viii (1902)

The American experience with prostitution over the last
hundred years is testament to the sagacity of Mr. Shaw. Even
the coercive machinery of the criminal law, not yet arrayed
against the sale of sexual services when Shaw penned *Mrs.
Warren's Profession*, has not extinguished the world's oldest
profession.

The State of Nevada, alone among the states, accommo-
dates this reality by permitting the sale of sexual services in
some of its counties.[1] Nevada combines partial legalization of
prostitution with stringent licensing and regulation, including
health screenings for sex workers, measures to protect sex
workers from coercion, and — the aspect of Nevada law here
challenged — restrictions on advertising by legal brothels.
We must decide whether the advertising restrictions violate
the First Amendment.

---

[1]From 1980 to 2009, so-called "indoor prostitution" was legal in Rhode
Island. Due to a statutory amendment in 1980, prostitution itself was not
expressly prohibited, although related activities such as "streetwalking"
were. Whether this state of the law was an oversight is not altogether
clear. Nevertheless, in 2009 the law was again amended and Rhode Island
now outlaws prostitution as does every other state except Nevada. *See* R.I.
Gen. Laws § 11-34.1-2 (2009); *see also* Lynn Arditi, *Bill signing finally
outlaws indoor prostitution in R.I.*, Projo 7 to 7 News Blog, *available at*
http://newsblog.projo.com/2009/11/governor-carcieri-signed-into.html
(last visited March 2, 2010).

# I.

## A.

The sale of sexual services in Nevada is prohibited unless conducted in designated brothels licensed by a county. Nev. Rev. Stat. § 201.354(1). State law prohibits counties of more than 400,000 residents from issuing such licenses, Nev. Rev. Stat. § 244.345(8), and counties with fewer than 400,000 residents are free to prohibit the sale of sexual services by local ordinance. The upshot is that licensed brothels do not operate in Clark County, which includes the city of Las Vegas, or in five of the fifteen remaining counties in Nevada.

State law establishes a strict regulatory regime governing brothels in the eleven counties that choose to license them. Sex workers are subject to mandatory health screening for sexually transmitted diseases, including HIV, Nev. Admin. Code §§ 441A.800-802, and brothel owners are liable for damages resulting from exposure to HIV, Nev. Rev. Stat. § 41.1397. Condom use is mandatory, § 441A.805, and all brothels must so notify customers, § 441A.810.

Several statutory provisions are directed to preventing coercion of sex workers by the operators of brothels and others. Section 201.300 makes criminal "pandering," defined to include, among other acts, inducing, persuading, encouraging, inveigling, or enticing a person to engage in the sale of sexual services. Nev. Rev. Stat. § 201.300; *see also* Nev. Rev. Stat. § 201.360 (prohibiting "placing" a person in a brothel). Detaining a person in a brothel because of debt is also forbidden. Nev. Rev. Stat. § 201.330. Section 201.320 makes it a crime to live from the earnings of a sex worker.[2]

---

[2]Enforcement of these laws to protect sex workers appears to be lacking. Alexa Albert's study of one prominent brothel reports that pimps remained common and some assaults against sex workers still occurred, yet the authorities were rarely notified of these criminal violations. *See* Alexa Albert, BROTHEL: MUSTANG RANCH AND ITS WOMEN 71-73, 153-54, 194 (2001).

The state's regulatory regime also restricts advertising by legal brothels. The principal restrictions are two: First, brothels are banned from advertising at all in counties where the sale of sexual services is prohibited by local ordinance or state statute. Nev. Rev. Stat. § 201.440.[3] Second, in counties where the sale of sexual services is permitted, brothels cannot advertise "[i]n any public theater, on the public streets of any city or town, or on any public highway." Nev. Rev. Stat. § 201.430(1).[4]

---

[3]Nev. Rev. Stat. § 201.440(1) provides:

In any county, city or town where prostitution is prohibited by local ordinance or where the licensing of a house of prostitution is prohibited by state statute, it is unlawful for any person, company, association or corporation knowingly to allow any person engaged in conduct which is unlawful pursuant to paragraph (b) of subsection 1 of NRS 207.030, or any owner, operator, agent or employee of a house of prostitution, or anyone acting on behalf of any such person, to advertise a house of prostitution in his place of business.

[4]Nev. Rev. Stat. § 201.430 provides:

Unlawful advertising of prostitution; penalties

1. It is unlawful for any person engaged in conduct which is unlawful pursuant to paragraph (b) of subsection 1 of NRS 207.030 [prohibiting prostitution solicited on the street], or any owner, operator, agent or employee of a house of prostitution, or anyone acting on behalf of any such person, to advertise the unlawful conduct or any house of prostitution:

(a) In any public theater, on the public streets of any city or town, or on any public highway; or

(b) In any county, city or town where prostitution is prohibited by local ordinance or where the licensing of a house of prostitution is prohibited by state statute.

2. It is unlawful for any person knowingly to prepare or print an advertisement concerning a house of prostitution not licensed for that purpose pursuant to NRS 244.345, or conduct which is unlawful pursuant to paragraph (b) of subsection 1 of NRS 207.030, in any county, city or town where prostitution is prohibited by local ordinance or where the licensing of a house of prostitution is prohibited by state statute.

The statutes further provide that:

> Inclusion in any display, handbill or publication of the address, location or telephone number of a house of prostitution or of identification of a means of transportation to such a house, or of directions telling how to obtain any such information, constitutes prima facie evidence of advertising for the purposes of this section.

Nev. Rev. Stat. § 201.430(3). Persons in violation of the advertising restrictions are subject to criminal penalties, including fines and imprisonment.

## B.

The publishers of two newspapers that circulate in areas of Nevada where prostitution is prohibited and the owner of a legal brothel in Nye County (all referred to, collectively, as Coyote Publishing) bring a facial challenge to Nev. Rev. Stat. §§ 201.430-440, alleging that the advertising restrictions violate the First Amendment of the U.S. Constitution and Article I, Section 9, of the Nevada Constitution.[5]

---

3. Inclusion in any display, handbill or publication of the address, location or telephone number of a house of prostitution or of identification of a means of transportation to such a house, or of directions telling how to obtain any such information, constitutes prima facie evidence of advertising for the purposes of this section.

   * * *

[5]Article I, Section 9 of the Nevada Constitution provides, in relevant part: "Every citizen may freely speak, write and publish his sentiments on all subjects being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

Because "Article I, Section 9 affords no greater protection to speech activity than does the First Amendment to the United States Constitu-

On summary judgment, the district court declared the advertising restrictions unconstitutional. The court first held that in light of section 201.430(3), which defines prima facie evidence of advertising, the restrictions reach beyond pure commercial speech. The district court therefore applied strict scrutiny and determined that the state did not offer any compelling interest in support of its policy. The district court then concluded, alternatively, that even severing 201.430(3) from the rest of the statute, the restrictions still failed the standard of intermediate scrutiny applicable to commercial speech announced in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980).

Nevada appeals, arguing that (1) intermediate scrutiny (or some lesser level of scrutiny) applies; (2) at least in counties where brothels are prohibited, advertising of brothels does not relate to legal activity and is therefore not protected by the First Amendment; and (3) the substantial state interest in preventing the commodification and commercialization of sex vindicates the advertising restrictions. Taking into account the quite unique characteristics, legal and social, of prostitution, we conclude that Nevada's regulatory scheme is consistent with the First Amendment and so reverse the ruling of the district court.

## II.

The threshold question is whether the advertising regulations at issue are subject to strict scrutiny or, as Nevada contends, to some lesser scrutiny.

---

tion[,] . . . under the Nevada Constitution, the appropriate analysis of . . . restrictions [on speech] is identical to that under the First Amendment." *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 100 P.3d 179, 187 (Nev. 2004) (citations omitted). We therefore address the issues in this appeal under federal constitutional standards.

**[1]** For much of our history the First Amendment was thought not to apply to advertising. *See, e.g.*, *Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942). More than thirty years ago, however, the Supreme Court determined that commercial speech is within the First Amendment's purview, albeit afforded only "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). Restrictions on commercial speech are now reviewed under the standard of intermediate scrutiny announced in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 563-66 (1980).[6]

**[2]** Speech is "commercial" if it does "no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (citation omitted). Coyote Publishing contends that Nev. Rev. Stat. § 201.430(3), which provides that "prima facie evidence" of advertising consists of the publication of the address, location, or telephone number of a brothel, or of directions on how to obtain such information, restricts more than pure commercial speech. They suggest that any publication containing information listed in § 201.430(3) — including, for instance, a hypothetical newspaper article covering the brothel industry — would be covered by the statutes.[7]

The Nevada courts have not expressly adopted any limiting construction of section 201.430(3) that cabins its reach to only commercial speech.[8] *Cf. Posadas de Puerto Rico Assocs. v.*

---

[6]Several justices criticized *Central Hudson* in subsequent cases, and the Court as a whole has acknowledged that criticism. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367-68 (2002). Nevertheless, *Central Hudson* remains the governing precedent. *See Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 903-04 (9th Cir. 2009).

[7]We note that such articles are not merely hypothetical. *See, e.g.*, Steve Friess, *Brothels Asked To Be Taxed, but Official Sees a Catch*, N.Y. Times, Jan. 26, 2009, at A11 (featuring a picture of a brothel that reveals its web address and phone number).

[8]*Princess Sea Industries, Inc. v. State*, 635 P.2d 281 (Nev. 1981) suggests such a limitation but does not make it explicit. In that case, the

*Tourism Co. of Puerto Rico*, 478 U.S. 328, 340 n.7 (1986) (relying on authoritative statutory constructions that limit the reach of advertising restrictions to purely commercial speech before applying intermediate scrutiny to the speech restrictions). Still, we are not persuaded that section 201.430 burdens any significant quantum of fully protected, non-commercial speech. Importantly, section 201.430(1) prohibits only brothel owners or persons "*acting on behalf of*" a brothel owner from advertising. (Emphasis added.) Thus, on a plain reading of the statute, the publisher of a news account would not be liable.

Moreover, under Nevada law, where a statutory provision makes certain facts "prima facie evidence" of other facts and the presumed facts establish guilt or an element of a criminal offense, a judge may only submit the presumption to the jury if "a reasonable juror on the evidence as a whole, including the evidence of the basic facts, could find guilt or the presumed fact beyond a reasonable doubt." Nev. Rev. Stat. § 47.230(2). In other words, only where the evidence, viewed as a whole, would permit a reasonable juror to conclude that the material was "advertising" would the prima facie provision have effect.[9]

**[3]** For these reasons and in the context of the present facial challenge, we have no difficulty concluding that

Nevada Supreme Court upheld the statutes at issue here against a First Amendment challenge, treating *Bigelow v. Virginia*, 421 U.S. 809 (1975), and other commercial speech precedents as controlling. *See Princess Sea*, 635 P.2d at 283. A concurring Justice "perceive[d] the advertisement as proposing no more than simply a commercial transaction, markedly different from advertising which contains factual material of clear 'public interest.' " *Id.* at 287 (Manoukian, J., concurring) (citing *Bigelow*, 421 U.S. at 822).

[9]Plainly, therefore, the regulations may not be applied to newspaper articles — or, for that matter, postings on internet message boards — by individuals acting independently of the brothels.

Nevada's advertising restrictions target pure commercial speech. Strict scrutiny, therefore, does not apply.[10]

Nevada argues, conversely, that something *less* than the intermediate scrutiny of *Central Hudson* is applicable. Pointing to *Posadas*, which upheld Puerto Rico's restrictions on casino gambling advertising directed at its residents, 478 U.S. at 344, the state urges that legislatures have greater power to regulate the advertising of so-called "vice" activities, which derives from their power to prohibit the underlying activity all together. "Vice is treated differently," the state contends, and because prostitution is particularly disfavored, the state's power to completely ban the activity includes the ability to ban its promotion, maintains the state.

*Posadas* certainly provides support for this proposition: "In our view," the Supreme Court held, "the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling." 478 U.S. at 345-46. Indeed, underscoring the applicability of this logic to the present case, *Posadas* endorsed the presumptive validity of the very Nevada statutes at issue here: *Posadas* cited Nevada Revised Statute §§ 201.430 & 201.440 and noted that "[i]t would . . . surely be a strange constitutional doctrine which would concede to the legislature the authority to totally ban a product or activity, but deny to the legislature the authority to forbid the stimulation of demand for the product or activity through advertising by those who would profit from such increased demand." 478 U.S. at 346.

---

[10]Coyote Publishing briefly argues that strict scrutiny applies because the advertising restrictions are content-based or because they comprise a total ban on truthful advertising. As to the first argument, "whether or not the . . . regulation is content-based, the *Central Hudson* test still applies because of the reduced protection given to commercial speech." *Metro Lights*, 551 F.3d at 903 n.6. Plaintiff's second argument is subsumed within the *Central Hudson* analysis, which considers at step four whether the restriction is "more extensive than . . . necessary." *Central Hudson*, 447 U.S. at 566.

Subsequent decisions, however, have cast severe doubt on the rule that restrictions on advertising of vice activity may escape the intermediate scrutiny of *Central Hudson* simply by virtue of the fact that they target vice. *Edge Broadcasting*, a case challenging restrictions on broadcast advertisements for state-run lotteries, did not reach the question, as it upheld the restrictions under the *Central Hudson* test. *United States v. Edge Broad. Co.*, 509 U.S. 418, 425 (1993).

In *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), a plurality of the Court considered and rejected the argument that the power to ban a vice activity necessarily includes the power to ban the accompanying commercial speech. *Id.* at 511. The plurality expressly disavowed *Posadas*, declaring that "it is no answer [to First Amendment challenges] that commercial speech concerns products and services that the government may freely regulate . . . ." *Id.* at 512.

**[4]** Decisions since *44 Liquormart* have applied intermediate scrutiny to strike down restrictions on the advertising of "vice activities," indicating by necessary implication that a more lenient standard than *Central Hudson* is not applicable. *See Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 195-96 (1999) (gambling); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 566 (2001) (tobacco products). As we are constrained to follow *Greater New Orleans Broadcasting* and *Lorillard*, we may not apply a general "vice exception" to the protections accorded to commercial speech.

Nevada also argues for an exception specific to prostitution. We agree that there are strong reasons why the sale of sexual services, in particular, ought to be treated differently than other advertising bans on "vice" activities.

The first derives from the degree of disfavor in which prostitution is held in our society, as reflected in law. In this respect, prostitution is sui generis. Forty-nine of the fifty

states today prohibit all sales of sexual services. The federal government acknowledges the link between prostitution and trafficking in women and children, a form of modern day slavery. *See* U.S. Department of State, *The Link Between Prostitution and Sex Trafficking* (November 24, 2004). And federal law prohibits the transportation of persons in interstate or foreign commerce for the purpose of prostitution or other illegal sexual activity. White Slave Traffic Act, 36 Stat. 825, 18 U.S.C. § 2421-2124 (1910). Although Nevada has opted for partial legalization, Nevada too has taken significant steps to limit prostitution, including the total ban on the practice in by far the largest population center,[11] the permission to other counties to ban the practice, and the advertising restrictions here at issue.

The social condemnation of prostitution, therefore, is vastly more widespread — and vastly more consistent — than in the case of other categories of "vice" that courts have considered, such as alcohol, tobacco products, and gambling. This condemnation may be relevant to the degree of scrutiny applicable to these advertising restrictions. The protection of commercial speech is at least in part instrumental, in the sense that courts are concerned about the efficient allocation of the underlying good or service. As the Supreme Court recognized in *Virginia State Board*, 425 U.S. at 765,

> [a]dvertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private eco-

---

[11]Clark County is home to 1,865,746 of the 2,600,167 people in Nevada, or approximately 72 percent of the state's population. U.S. Census Bureau, *Clark County, Nevada Quickfacts*, http://quickfacts.census.gov/qfd/states/32/32003.html (January 21, 2010).

nomic decisions . . . . To this end, the free flow of commercial information is indispensable.

*See also In re R. M. J.*, 455 U.S. 191, 201 n.11 (1982) ("The commercial speech doctrine is . . . based in part on certain empirical assumptions as to the benefits of advertising."). When the underlying service is of extremely little value, as demonstrated by near consensus within our society, the need for its efficient allocation and distribution is less compelling.

The nature of the market in sexual services, such as it is, provides an additional reason why the goal of efficiency applies with less force. In light of prevailing sexual mores, a highly transparent, and thus efficient, market for sex is a chimera. In this respect, sex is not a commodity.[12] Commercial speech decisions routinely display concern over the risk of distortion of competitive markets. *Greater New Orleans Broadcasting*, 527 U.S. at 189-91, for example, struck down a restriction on advertising of gambling in large part because it favored tribal commercial casinos over non-tribal commercial casinos; *44 Liquormart,* 517 U.S. at 502, invalidated a ban on price advertising of liquor that "like a collusive agreement among competitors . . . [would] tend to mitigate competition and maintain prices at a higher level than would prevail in a completely free market"; and *Central Hudson*, 447 U.S. at 570, disapproved a ban on advertising electricity because of the risk that it would stifle innovation in the energy sector. In the context of the *legal* sale of sexual acts, in contrast, there is relatively little market competition to distort.[13]

---

[12]Avoiding the complete commodification of sex is the state interest that Nevada asserts in support of its advertising restrictions. We assess the substantiality of this interest in Part II-A of this opinion.

[13]We make this observation in part because of the limited extent of the market, but also because of the lack of transparency inherent in commercial sexual transactions. Even in legal brothels in Nevada, for example, prices typically are not agreed upon until *after* a sex worker and client have removed to a private room. *See* Alexa Albert, Brothel 19-20.

Commercial speech doctrine also has been driven in part by objections to paternalistic regulatory policies, which assume that individual consumers need to be protected from their own choices. *See Virginia State Bd.*, 425 U.S. at 770; *44 Liquor-mart,* 517 U.S. at 503 (plurality opinion). Nevada's advertising restrictions, however, are not based on the premise that consumers of the advertising will act "irrationally" to their own detriment. *See id.* Instead, as developed later, a central premise of the restrictions is that the advertising of prostitution is an integral aspect of, and exacerbates, the commodification of human sexuality on a society-wide basis. Regulations that are addressed to the third-party effects of private transactions, not to protecting people from themselves, are more likely to be consonant with First Amendment values.

**[5]** Thus, two of the core justifications for protecting commercial speech — facilitating efficient market exchange and shunning paternalism — apply with less force in this context. Nevertheless, we follow the Supreme Court's lead and apply *Central Hudson* where it provides "an adequate basis for decision." *Lorillard*, 533 U.S. at 554-55; *Greater New Orleans Broad.*, 527 U.S. at 184. The distinctive contours of the problem of prostitution outlined above are relevant to the *Central Hudson* analysis. But they do not require that we discard the overall standard altogether rather than incorporating the points of distinction where they fit when applying that standard, as we shall do later in this opinion.

---

We are, of course, aware of the existence of a vast illegal market in sexual acts, in Nevada and elsewhere. *See id.* at 171 (describing the abundance of advertisements for "Entertainers" in the Las Vegas Yellow Pages). Commercial speech doctrine, however, is not concerned with the efficient operation of illegal, "black" markets. *See United States v. Williams*, 128 S.Ct. 1830, 1841 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."). In any event, these markets, precisely because they are illegal, are less transparent and efficient than their size would otherwise predict.

**[6]** We therefore apply the familiar four-part test:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566.

Because, as will appear, Nevada's interest in limiting the commodification of sex is important to the analysis at each step, we begin by assessing the substantiality of that interest. We then turn to the remaining steps of *Central Hudson*.

### A.

We first consider whether Nevada has asserted substantial state interests in support of its advertising restrictions. Nevada relies largely on an asserted interest in limiting the commodification of sex.[14]

---

[14]In their submissions, Coyote Publishing characterizes this interest as "not allowing minors to learn of the existence of legal brothels." We do not understand Nevada's argument to be so narrow. Nevada's opening brief explains that the advertising restrictions serve to "limit[ ] prostitution's profile in society." Thus, although Nevada does argue in particular that children should not be exposed to prostitution advertisements, the state's concern over sex commodifying advertisements goes beyond children to encompass society in general.

To the extent that Nevada asserts an interest in protecting minors from age-inappropriate messages, the advertising restrictions may well be overbroad with respect to such an interest because not sufficiently tailored to avoid infringing on advertising directed to adults. *See Lorillard*, 533 U.S.

We are aware of no case that considers the substantiality of a state's interest in preventing commodification — the turning of a good or service into a commodity to be bought and sold — for purposes of constitutional balancing. But the bedrock idea that "[t]here are, in a civilized society, some things that money cannot buy" is deeply rooted in our nation's law and public policy. *See In re Baby M*, 537 A.2d 1227, 1249 (N.J. 1988). The Thirteenth Amendment to the U.S. Constitution enshrines the principle that people may not be bought and sold as commodities. Payment for consent to adoption of a child is widely prohibited. *E.g.*, Cal. Pen. Code § 273; *see also In re Adoption of Paul*, 550 N.Y.S.2d 815, 817-18 (N.Y. Fam. Ct. 1990). In many states, surrogacy contracts are unenforceable, *e.g.*, Mich. Comp. Laws § 722.855 ("A surrogate parentage contract is void and unenforceable as contrary to public policy."), and payment of money in exchange for surrogacy is prohibited, *e.g.*, Ariz. Rev. Stat. § 25-218 (abrogated on other grounds by *Soos v. Superior Court*, 897 P.2d 1356 (Ariz. Ct. App. 1994)); *see generally* Noa Ben-Asher, *The Curing Law: On the Evolution of Baby-Making Markets*, 30 CARDOZO L. REV. 1885, nn.128-131 (2009). Federal law forbids the sale of human organs. National Organ Transplant Act, Pub. L. No. 98-507, 98 Stat. 2339, 42 U.S.C. § 274e (1984).[15]

---

at 564-65; *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73-74 ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox."). We need not decide whether that is so or not, as we conclude that the restriction is valid without regard to the asserted state interest in protecting children in particular.

[15]We do not mean by recording these somewhat analogous circumstances to suggest that the same considerations that apply to evaluating bans on advertising prostitution would apply with equal force in other contexts. As to surrogacy, for example, there are swiftly evolving public policy approaches in various states, including an extensive, fully legal market. *See* Gestational Surrogacy Act, 750 Ill. Comp. § 47/1514-190.9 (2003); N.H. Rev. Stat. § 168-B:16 (1990). Many of the key considerations we rely on here with regard to prostitution therefore do not apply.

These public policies may be motivated in part by concerns about the indirect consequences of permitting such sales, but they are also driven by an objection to their inherent commodifying tendencies — to the buying and selling of things and activities integral to a robust conception of personhood. *See Baby M*, 537 A.2d 1227, 1234 (declaring paid surrogacy contracts "potentially degrading to women"); *see also* Margaret Jane Radin, *Market-Inalienability*, 100 HARV. L. REV. 1849, 1912 (1987) ("[W]e accept an inferior conception of personhood . . . if we suppose people may freely choose to commodify themselves.").

Whether the law *ought* to treat sex as something, like babies and organs, that is "market-inalienable," or instead should treat it as equivalent to the sale of physical labor, is a question much contested among legal academics and philosophers. *Compare* Radin at 1924-25 (advocating a system of incomplete commodification of sexuality in which decriminalization of prostitution is coupled with restrictions on capitalist entrepreneurship and advertising — a system much like Nevada's) *with* Ann Lucas, *The Currency of Sex: Prostitution, Law, and Commodification*, *in* RETHINKING COMMODIFICATION 248, 254-58 (Ertman & Williams eds., 2005) (arguing that the idea that the sale of sex is damaging to personhood is culturally contingent and paternalistic). And it may well be that limiting the commodification of human sexuality is in some tension with other ostensible goals of Nevada's scheme, such as protecting women from being forced into prostitution and empowering them to make choices in the course of selling sexual services. *See* Martha C. Nussbaum, *Taking Money for Bodily Services*, *in* RETHINKING COMMODIFICATION 243, 246-47 (Ertman & Williams eds., 2005) (arguing that failure to recognize that the sale of sexual services is akin to the sale of any other manual labor is the largest obstacle to improving conditions for sex workers). But these questions are not for us to decide. In most cases that we can imagine — slavery, given the Thirteenth Amendment, being an obvious exception — including this one, it belongs to the political branches to fix

the boundary between those human interactions governed by market exchange and those not so governed. In every state but Nevada, that boundary has been drawn so as to forbid such transactions entirely, including the proposing of such transactions through advertising. Nevada has, uniquely for this country, delineated a more nuanced boundary, but still seeks to closely confine the sale of sex acts, geographically, through restrictive licensing where legal, and through the advertising restrictions.[16] We conclude that the interest in preventing the commodification of sex is substantial.

We emphasize that our holding is grounded in two distinctive characteristics of prostitution, each of which is critical to our conclusion:

**[7]** First, prohibitions on prostitution reflect not a desire to discourage the underlying sexual activity itself but its *sale.* Prostitution without the exchange of money is simply sex, which in most manifestations is not a target of state regulators. *But cf. Lawrence v. Texas*, 539 U.S. 558 (2003). The risk that states will cite the risk of commodification as a fig leaf for hostility to the underlying "product," so to speak — which might be present if an anti-commodification rationale were advanced to justify bans on other types of advertising — is minimal here. More fundamentally, this genuine objection to buying and selling means that in the context of prostitution an advertisement is an integral aspect of the harm to be avoided. In contract terms, an advertisement is an invitation to deal and may operate as an offer, though in the typical case it does not bind the seller. *See* Joseph M. Perillo, I CORBIN ON

---

[16]Nevada's approach of partial legalization and strict regulation does find analogues in several foreign jurisdictions. *See*, *e.g.*, Prostitution Reform Act 2003, 2003 S.N.Z. No. 28 (N.Z.); Prostitution Act, 1992 (Austl.); Mohamed Y. Mattar, *Trafficking in Persons, Especially Women and Children, in Countries of the Middle East: The Scope of the Problem and the Appropriate Legislative Responses*, 26 FORDHAM INT'L L. J. 721, 735 (2003) *citing* Law of 6 February 1931, art. 7 (Leb.).

CONTRACTS § 2.4 (1993). Speech that "does no more than propose a commercial transaction," *see Virginia Bd. of Pharmacy*, 425 U.S. at 762, is particularly susceptible to regulation when the state's objection is to the commercial transaction itself.

**[8]** Second, public disapproval of prostitution's commodifying tendencies has an impressive historical pedigree. In the minds of early opponents, prostitution was closely bound up with slavery — the paradigmatic case of a dehumanizing market transaction. *See* Maude E. Miner, *The Slavery of Prostitution: A Plea for Emancipation* ix (1916) (doctoral thesis at Columbia University) ("[Women Offenders'] demoralization of character has constituted moral enslavement."); Amy Dru Stanley, FROM BONDAGE TO CONTRACT 219 & 237 (1998) (citing Massachusetts Bureau of Statistics of Labor, *Third Annual Report* 117 (1872) (lamenting that prostitution implied "the necessity of making merchandise of body and soul")).

The sale of sex was not widely criminalized for much of our nation's history. Prostitution was instead covered only by prohibitions on vagrancy and "streetwalking"; the bans did not extend to brothels or other indoor locations in which sale of sex occurred. *See* Howard B. Woolston, PROSTITUTION IN THE UNITED STATES 25 (1920); Ruth Rosen, THE LOST SISTERHOOD 36 (1982). The legal condemnation of prostitution as such did not arrive until after the Civil War, when a coalition of prominent abolitionists and feminists defeated attempts to license houses of prostitution in several states. David J. Pivar, PURITY CRUSADE: SEXUAL MORALITY AND SOCIAL CONTROL, 1868-1900, 52, 55, 67 (1973). William Lloyd Garrison lent his name to anti-licensing efforts, *id.* at 67, which often explicitly invoked slavery and the evils of commodification, *see* Stanley, FROM BONDAGE TO CONTRACT at 257-58 (quoting Elizabeth Blackwell, *The Purchase of Women: The Great Economic Blunder* (1916) (originally published 1886) ("[T]he slaveholding principle that the human

body may be an article of merchandise is still applied to women.”)).

The anti-commodification orientation of the early opponents of legalized prostitution was reflected in the nature of the criminal prohibitions adopted early in the twentieth century. Criminal laws were not directed at women themselves but at those profiting from “commercialized forms of vice.” *See* Woolston at 32. “Between 1911 and 1915, . . . practically every state in the Union [passed] laws punishing those guilty of forcing girls and women into prostitution, those guilty of pandering, and those living off the earnings of prostitution.” *Id.* In 1910, Congress passed the White Slave Traffic Act, underscoring the extent to which policymakers associated prostitution with involuntary servitude and the overriding concern with commercial manifestations of the practice, especially interstate and international trafficking in women. 36 Stat. 825 (1910).

[9] Though attitudes towards the sale of sexual services have continued to change and evolve since the early twentieth century, this history reinforces the conclusion that Nevada’s objection is genuinely to the buying and selling of sex. Banning commodification of sex entirely is a substantial policy goal that all states but Nevada have chosen to adopt. Uniquely among the states, Nevada has not structured its laws to pursue this substantial state interest to the exclusion of all others. Rather, it has adopted a nuanced approach to the sale of sexual services, grounded in part in concern about the negative health and safety impacts of unregulated, illegal prostitution. By permitting *some* legal prostitution, Nevada has been able to subject a portion of the market for paid sex to extensive regulation, while continuing severely to limit the diffusion of sexual commodification through its banning of prostitution where by far most Nevadans live (and where most outsiders visit), Clark County.[17]

---

[17]We note that although official enforcement of some of the prostitution regulations may be inconsistent, *see supra* note 2, the sociological evi-

**[10]** Nevada has therefore struck its own idiosyncratic balance between various important but competing state interests. The state's dual approach does not make its asserted interest in limiting commodification of sex any less substantial than in the states that ban commercial sex transactions entirely. Instead, it is the other primary aspects of the *Central Hudson* analysis that may be implicated by Nevada's divided approach — whether the speech regulations "directly and materially" advance the state's interest in limiting commodification of sex, and whether the regulations are narrowly tailored. *See Greater New Orleans Broad.*, 527 U.S. at 188.

Before addressing those questions, however, we pause briefly to consider whether prostitution is "legal activity" in Nevada, a threshold requirement for speech to receive constitutional protection under *Central Hudson*, concluding that the complexities of Nevada's regulatory scheme make the question a difficult one and one unnecessary to decide in this case.

## B.

*Central Hudson* specifies that if the regulated speech concerns illegal activity or is misleading, the First Amendment extends no protection and the analysis ends. 447 U.S. at 563-64. Nevada does not assert that the advertising of prostitution is false, deceptive, or misleading, so we confine our discussion at this step to the legality of prostitution.

Nevada contends that the advertising at issue is unprotected, at least in those counties where prostitution is prohib-

---

dence suggests that the effort to fight sexually transmitted diseases and violence in brothels has been highly successful overall. *See* Alexa E. Albert, David Lee Warner & Robert Hatcher, *Facilitating Condom Use with Clients during Commercial Sex in Nevada's Legal Brothels*, 88 Am. J. Pub. Health 643, 644 (1998); Alexa Albert, Brothel at 153; Barbara Brents & Kathryn Hausbeck, *Violence and Legalized Brothel Prostitution in Nevada: Examining Safety, Risk, and Prostitution Policy*, 20 J. Interpersonal Violence 270, 286 (2005).

ited, because prostitution is not legal activity in those counties. Prostitution *is* legal, however, in the counties that house licensed brothels, and it is made legal pursuant to the laws of Nevada, not the laws of some other jurisdiction.

The question whether a state can ban advertising of a transaction legal where it is finally carried out but not where it is proposed through advertising does not arise in the typical commercial speech case. Often, the two jurisdictions are one and the same. *See*, *e.g.*, *Lorillard*, 533 U.S. at 533-34 (considering intra-state tobacco advertising and sales). In other instances, the laws of the two jurisdictions do not materially differ. For example, in *Bigelow v. Virginia*, involving a challenge to Virginia's attempt to restrict the advertising of abortion services available in New York, there was "[n]o claim . . . that the advertisement . . . related to a commodity or service that was then illegal in either Virginia or New York." 421 U.S. 809, 828 (1975). In both *Edge Broadcasting* and *Greater New Orleans Broadcasting*, involving challenges to *federal* restrictions on gaming advertisements, individual states had banned the gaming activities at issue, but it was the federal government that was regulating speech, and federal law did not ban the activities. 509 U.S. at 426; 527 U.S. at 180, 183. Here, by contrast, the regulating jurisdiction — the state of Nevada — *has* made prostitution illegal, at least in its major population center.

Moreover, in *Bigelow*, *Edge Broadcasting*, and *Greater New Orleans Broadcasting*, the interests asserted to justify the restrictions had nothing to do with the direct effects of the advertising at the time and place of consumption of those advertisements, *i.e.*, in the jurisdiction where the advertised activity was illegal. Rather, those restrictions were justified in terms of the negative consequences that might flow from residents of one state traveling to another to obtain a service. *See Bigelow*, 421 U.S. at 824 ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be

affected when they travel to that State."); *Edge Broad.*, 509 U.S. at 433-34 (describing the restrictions' purpose as "discouraging [non-lottery state residents'] participation in lotteries"); *Greater New Orleans Broad.*, 527 U.S. at 185 (describing the restrictions' purpose as "reducing the social costs associated with [casino gambling]").[18] It is consistent with fundamental precepts of our federal system that the law of the jurisdiction where the transaction is proposed should govern the legality of those transactions, as citizens of one state ordinarily are free to travel to another state and have their behavior governed by the law of that second state. *See Saenz v. Roe*, 526 U.S. 489, 500-02 (1999).

Nevada's asserted interest in limiting commodification of sex differs in a significant respect from the interests considered in *Bigelow, Edge Broadcasting*, and *Greater New Orleans Broadcasting*. An advertisement that proposes the sale of a sexual act does not merely create a risk that a consumer of that message will travel in pursuit of such a transaction. Instead, an advertisement for sex *itself* creates the commodification harm that Nevada seeks to limit. The regulating jurisdiction thus has a different and greater interest, vis-a-vis the jurisdiction where the transaction is proposed, in the context of prostitution than in other commercial speech contexts.

There may, therefore, be some merit to Nevada's novel argument that the legality of prostitution ought to be assessed by reference to the law of the counties in which the advertising occurs, rather than the law of the counties in which the proposed transaction would take place. We need not decide,

---

[18]In *Washington Mercantile Association v. Williams*, 733 F.2d 687, 691 (9th Cir. 1984), we upheld a restriction on the advertising of drug paraphernalia under *Central Hudson*. In the course of that decision, we observed, "[T]he advertiser who proposes a transaction in a state where the transaction is legal is promoting a legal activity." As in the Supreme Court cases we have discussed, the regulating state in *Washington Mercantile* did not assert any interest in preventing harms inherent in the advertising messages.

however, how the illegality concept applies in this case. Even if we agreed with Nevada, the fact remains that Nevada's position on the legality of prostitution in much of the state is essentially agnostic: county governments are free to license or prohibit brothels at their option. *See* Nev. Rev. Stat. § 244.345. We would therefore have to proceed to the remaining steps of the *Central Hudson* analysis in any event. And as we develop in the ensuing discussion, the Nevada advertising restrictions are valid — because narrowly tailored to advance the interest in limiting commodification of sex — even if we assume that the speech in question is accorded commercial speech protection, rather than ousted from any protection under the illegal transaction exception. There is therefore no need to decide whether some of the advertising is entirely unprotected speech under the *Central Hudson* illegality prong, and we do not do so.

## C.

At step three of *Central Hudson*, we ask whether Nevada's commercial speech restrictions "directly and materially advance[ ]" its asserted interest in limiting the commodification of sex. *See Greater New Orleans Broad.*, 527 U.S. at 188.

**[11]** Increased advertising of commercial sex throughout the state of Nevada would increase the extent to which sex is presented to the public as a commodity for sale. The advertising restrictions advance the interest in limiting this commodification in two closely related ways. First, they eliminate the public's exposure — in some areas entirely, and in others in large part — to advertisements that are in themselves an aspect of the commodifying of sex. As the harm protected against occurs in part from the proposal of the transaction, banning or restricting the advertising directly reduces the harm.

**[12]** Second, the advertising restrictions directly and materially advance Nevada's interest in limiting commodification

by reducing the market demand for, and thus the incidence of, the exchange of sex acts for money, which by definition is commodifying of sex. Nevada *might* be able to reduce the buying and selling of sex acts to a greater degree by instituting a complete ban on prostitution (although there has been no showing that the actual incidence of acts of prostitution, legal and illegal, in Nevada is greater than it would be under a total ban). But it has chosen to take an approach to reducing demand that will not short-circuit the health and safety gains that come with partial legalization.

Nevada's chosen approach directly and materially advances the state's policy of limiting commodification without undermining its competing health and safety goals. Common sense counsels that advertising tends to stimulate demand for products and services. Conversely, prohibitions on advertising tend to limit demand. *See Edge Broad.*, 509 U.S. at 434 ("[T]he Government may be said to advance its purpose [of reducing demand for lotteries] by substantially reducing lottery advertising . . . ."); *Posadas*, 478 U.S. at 344; *Valley Broad. Co. v. United States*, 107 F.3d 1328, 1334 (9th Cir. 1997); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) ("It is assuredly a matter of 'common sense' . . . that a restriction on the advertising of a product characteristic will decrease the extent to which consumers select a product on the basis of that trait."). Reducing the demand for commercial sex acts in turn limits the commodification of sex.

At the same time, Nevada's decision to legalize prostitution obviously contributes to some extent to the commodification of sex. *See* Michael Shapiro, *Regulation as Language: Communicating Values by Altering the Contingencies of Choice*, 55 U. PITT. L. REV. 681, 687 (1994). Yet, as will appear from our discussion of tailoring, *infra*, this is not a case where the advertising restrictions *themselves* contain exceptions that so "undermine and counteract" the asserted interest that the restrictions fail the tailoring requirement. *See Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 905 (9th Cir.

2009) (quoting *Rubin*, 514 U.S. at 487); *cf. Greater New Orleans Broad.*, 527 U.S. at 194-95. As the cases bearing on tailoring illustrate, incoherence in the operation of speech regulations can be fatal to the constitutionality of a scheme of regulation. In contrast, the fact that banning the underlying activity outright would also promote the interest advanced by restricting advertising does not by itself render a commercial speech regulation unconstitutional. To so hold would be tantamount to requiring that government utilize the least speech restrictive means, which the Supreme Court has made clear is not a sine qua non under *Central Hudson*. *See Greater New Orleans Broad.*, 527 U.S. at 188. Rather, at step three of *Central Hudson*, we need only examine the contribution that the advertising restrictions make to advancing the interest. Here, the restrictions on prostitution advertising directly and materially advance Nevada's interest in limiting the commodification of sex.

Coyote Publishing suggests that Nevada's interest in limiting commodification is not materially advanced by the ban on brothel advertising in the counties where they are not legal because sexually suggestive material is already widely displayed in Nevada. The argument misses the point. Nevada seeks to limit the message that sex may be bought and sold. It does not object to sex per se, or to messages that utilize sexual innuendo to sell other products. The persistence of those other elements in Nevada society does not defeat Nevada's interest.

To be sure, there are goods and services for sale in the state of Nevada whose advertisement may contribute to the commodification of human sexuality but that escape the advertising ban at issue here — for example, shows featuring nude dancers. But Nevada asserts an interest in limiting the commodification of sexual acts; the buying and selling of nude images is a different concern. Nor is this distinction too fine for purposes of the First Amendment. It is the very distinction

that drives the legislative choices of the many states that permit nude dancing but not prostitution.[19]

**[13]** In sum, we conclude that Nevada's substantial interest in limiting the commodification of sex is directly and materially advanced by the restrictions on brothel advertising.

### D.

**[14]** Finally, we must assess whether the restrictions on advertising are "more extensive than necessary" in light of Nevada's interests. *Central Hudson*, 447 U.S. at 566. "The Government is not required to employ the least restrictive means conceivable," but "it must demonstrate narrow tailoring of the challenged regulation to the asserted interest — a fit that is not necessarily perfect, but reasonable . . . ." *Greater New Orleans Broad.*, 527 U.S. at 188 (internal quotation marks omitted).

**[15]** Nevada bans brothel advertising completely in counties where prostitution is illegal. In light of the fact that prostitution advertisements are themselves an aspect of the commodification harm that Nevada seeks to limit, we have no trouble concluding that the advertising restrictions are narrowly tailored. Every advertisement for prostitution that is not seen contributes to limiting the commodification of sex, both directly and by reducing demand. Coyote Publishing points to no application of the law that would fail to advance Nevada's interest. *Cf. Lorillard*, 533 U.S. 561-64 (striking down restrictions on tobacco advertising justified only with respect to protecting children because the restrictions infringed

---

[19]*See* Cal. Penal Code § 318.5; N.C. Gen. Stat. Ann. § 14-190.9; Mass. Gen. Laws Ann. ch. 140, § 183A; Federal Heights Mun. Code ch. XII, art. XII, § 12-12-11(B), cited in *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1279 n.5 (10th Cir. 2002) (Colorado).

substantially on communications that targeted adults, not children).[20]

Nevada's approach in counties where prostitution is legal is less straightforward. In those counties, legal brothels may advertise, but may not do so "[i]n any public theater, on the public streets of any city or town, or on any public highway." Nev. Rev. Stat. § 201.430(1)(a). This aspect of Nevada's scheme requires a more in-depth analysis of tailoring, which has proven the most exacting requirement of *Central Hudson* in recent cases. In *44 Liquormart*, for example, the opinions that made up the Court's fractured disposition agreed that Rhode Island had offered no satisfying reason why its purported goal of increasing liquor prices was better served by advertising restrictions than by "obvious" alternative means. *See* 517 U.S. at 507, 530. And in *Greater New Orleans Broadcasting*, the regulatory scheme failed the tailoring requirement because it arbitrarily discriminated between tribal and non-tribal commercial casinos and fell short of "a rough approximation of efficacy." 527 U.S. at 189-91, 194-95.

Nevada's scheme does not suffer from these infirmities. Nevada's choice to pursue its state interests by regulating advertising rather than the alternative means of banning all prostitution directly is a unique one in this country, but not one without a well-developed policy basis: partial legalization and regulation serves Nevada's competing, substantial inter-

---

[20]We note that for a state that uniformly prohibits both prostitution and prostitution advertising, the tailoring inquiry would end there. There can be no question that a decision by California or Arizona to ban within their borders the advertising of prostitution legal in Nevada would survive this step — and the foregoing steps — of *Central Hudson*, just as there can be no question that the United States would not be prevented by the First Amendment from banning advertising within its borders of child prostitution establishments located in an overseas jurisdiction where such establishments are legal. Where a regulating jurisdiction seeks to limit the commodification of sex, a uniform ban on prostitution advertising is well-tailored to that goal.

ests in preventing the spread of sexually transmitted disease and protecting sex workers from abuse. *Cf. 44 Liquormart*, 517 U.S. at 530 ("The ready availability of [alternatives]—at least some of which would far more effectively achieve Rhode Island's *only professed goal*, at comparatively small additional administrative cost—demonstrates that the fit between ends and means is not narrowly tailored.") (O'Connor, J., concurring) (emphasis added). The First Amendment does not require that a regulatory regime single-mindedly pursue one objective to the exclusion of all others to survive the intermediate scrutiny applied to commercial speech regulations.

**[16]** In permitting some unobtrusive, non-public forms of advertising in counties where brothels are legal, Nevada has achieved "a fit that is not necessarily perfect, but reasonable." *Greater New Orleans Broad.*, 527 U.S. at 188. By keeping brothel advertising out of public places, *see* Nev. Rev. Stat. § 201.430(1)(a), where it would reach residents who do not seek it out, but permitting other forms of advertising likely to reach those already interested in patronizing the brothels, Nevada strikes a balance between its interest in maintaining economically viable, legal, regulated brothels and its interest in severely limiting the commodification of sex.

**[17]** Especially in light of the fact that this is a facial challenge, we are unable to strike down these regulations. As we held in rejecting another First Amendment challenge to advertising restrictions, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep to justify invalidating the statute on its face." *Wash. Mercantile*, 733 F.2d at 692 (internal quotation marks omitted). Nevada has tailored its restrictions on advertising to attain a reasonable fit between ends and means.

## III.

**[18]** In sum, we hold that the restrictions on brothel advertising contained in Nevada Revised Statute §§ 201.430-440 are consistent with the First Amendment.

REVERSED.

---

NOONAN, Circuit Judge, concurring:

I agree with the result of Judge Berzon's thoughtful opinion. I take a different route to reach it.

Nevada states that its advertising restrictions are intended to protect minors. But such a rationale scarcely suffices to justify restrictions on speech intended for adults. *See, e.g.*, *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 875 (1997) (The "governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults."). Nevada's other articulation of Nevada's interest in restricting advertising in Nevada by brothels licensed as lawful by Nevada counties is that Nevada seeks "to limit the profile of prostitution" in Nevada. Obviously that limitation is the purpose of the Nevada statutes. But the purpose of the statutes is not the same as the interest that the state is seeking to protect. Nevada, in the presentation of its case to us, has not articulated the state's interest as fully as one might hope.

Neither Judge Berzon nor I takes this failing to be the end of state's case. Judge Berzon finds the state's interest implicit in its other arguments. The state, she says, has an interest in preventing the sale of sexual intercourse by human beings. The state could prohibit such sale entirely. Forty-nine states and six Nevada counties, including the county containing Las Vegas, do. But the state may take a half-step: it may ban the

advertising of brothels in counties where they are unlawful, and limit the advertising of brothels where they are permitted.

I agree with the offered rationale, but recognize that to use it we are relying on a kind of state interest not heretofore addressed in the *Central Hudson* line of cases. We recognize that the sexual intercourse of human beings is not like gambling, drinking, or smoking. As Nevada tells us in its brief, it is sui generis. It is an act performed in private. It is an act not usually engaged in with strangers. It is an act limited by law as to age and blood relationship. It is the way that human life is usually propagated. It is the way that families are usually formed. It is the way in which human love finds its fullest physical expression.

The state of Nevada has proclaimed its interest in this activity by its statutes regulating the creation of marriage, Nev. Rev. Stat. §§ 122.002-122.270; by its statutes governing the dissolution of marriage, *id.* §§ 125.005-125.560; by its statutes specifying the devolution of intestate property, *id.* §§ 134.005-134.210; by its statutes governing the emancipation of minors, *id.* §§ 129.080-129.140; and by its statute shielding spouses from testifying against each other, *id.* § 49.295. The network of laws setting off married couples from unmarried individuals testifies to the central role of sexual intercourse in civil society in Nevada as elsewhere in the United States. Nevada's interest in preventing advertisements for the sale of an activity central to the domestic life of its inhabitants does not need to be spoken by its attorney general. Its interest is stated in its statutes.

No need to go further to defend the Nevada statutes at issue. I strengthen the argument by noting Footnote 20 of Judge Berzon's opinion. It states, there is no question that California or Arizona could constitutionally ban the advertising of the legal Nevada brothels and that the United States similarly could ban the advertisement of child prostitution that was lawful in a foreign jurisdiction. I agree. But why can such

activity lawful in one jurisdiction be kept from being advertised in another jurisdiction? The answer, implicit in Judge Berzon's opinion, is that California, Arizona, or the United States may constitutionally suppress speech that offers sexual intercourse for sale.